## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AU OPTRONICS CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | C.A. No. 07-357-JJF |
| LG. PHILIPS LCD CO., LTD. and<br>LG. PHILIPS LCD AMERICA, INC. | § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |
| | § § | |
| LG. PHILIPS LCD CO., LTD. and<br>LG. PHILIPS LCD AMERICA, INC. | § § § | |
| Counterclaim Plaintiffs, | § § | |
| v. | § § | |
| AU OPTRONICS CORPORATION;<br>AU OPTRONICS CORPORATION<br>AMERICA; CHI MEI OPTOELECTRONICS<br>CORPORATION; and CHI MEI<br>OPTOELECTRONICS USA, INC., | § § § § § § | JURY TRIAL DEMANDED |
| Counterclaim Defendants. | § § | |

## AU OPTRONICS CORPORATION'S FIRST AMENDED REPLY TO LG.PHILIPS LCD CO. LTD.'S COUNTERCLAIMS AND COUNTERCLAIMS AGAINST LG.PHILIPS LCD CO., LTD.

Plaintiff AU OPTRONICS CORPORATION ("AUO") hereby replies to LG.Philips LCD Co., Ltd.'s ("LPL") counterclaims filed on or on about June 11, 2007, asserts affirmative defenses to those claims, and asserts counterclaims against LPL.

### REPLY TO COUNTERCLAIMS

1.     With regard to paragraph 23, AUO denies that LPL is entitled to any relief by virtue of its counterclaims.

2.     AUO is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 24 and therefore denies them.

3.     AUO is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 25 and therefore denies them.

4.     AUO admits that it is a Taiwanese corporation, and it has a place of business at No. 1, LI-Hsin Road 2, Hsinchu Science Park, Hsinchu Taiwan, R.O.C., and that it manufactures LCD products.  AUO further avers that the remaining allegations in paragraph 26 contain characterizations and generalizations in violation of Fed. R. Civ. P. 8's requirement that "[e]ach averment of a pleading shall be simple, concise, and direct," and otherwise denies such allegations.

5.     AUO admits that AU Optronics Corporation America is a California corporation.  AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of paragraph 27 and therefore denies them.

6.     AUO is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 28 and therefore denies them.

7.     AUO is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 29 and therefore denies them.

8.     AUO is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 30 and therefore denies them.

9.     AUO admits the allegations of paragraph 31.

10.    AUO admits that LPL's Counterclaims purport to set forth claims arising under the patent laws of the United States (Title 35 of the United States Code).  AUO is without

sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore denies them.

11.    AUO admits that LPL's Counterclaims purport to set forth a declaratory judgment claim under 28 U.S.C. §§ 2201 and 2202, and under the patent laws of the United States (Title 35 of the United States Code).  AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 33 and therefore denies them.

12.    AUO understands that paragraph 34 references LPL's patent infringement claims, and on that basis, subject matter jurisdiction is proper over LPL's patent infringement claims against AUO under 28 U.S.C. § 1331 and 1338(a).

13.    AUO understands paragraph 35 to refer to subject matter jurisdiction.  AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies them.

14.    AUO denies the allegations of paragraph 36.

15.    AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 37 and therefore denies them.

16.    AUO denies the allegations of paragraph 38 that are directed at AUO. AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 38 and therefore denies them.

## THE PATENTS-IN-SUIT

17.    AUO admits that the '274 Patent appears to be entitled "Thin-Film Transistor And Method Of Making Same."  AUO denies that the '274 Patent was duly and legally issued.

AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 39 and therefore denies them.

18.     AUO admits that the '321 Patent appears to be entitled "Thin-Film Transistor And Method Of Making Same." AUO denies that the '321 Patent was duly and legally issued. AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 40 and therefore denies them.

19.     AUO admits that the '489 Patent appears to be entitled "Thin-Film Transistor And Method Of Making Same." AUO denies that the '489 Patent was duly and legally issued. AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 41 and therefore denies them.

20.     AUO is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 42 and therefore denies them.

21.     AUO denies the allegations of paragraph 43 that are directed at AUO. AUO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 43 and therefore denies them.

## COUNT I

22.     AUO refers to and incorporates herein its responses to paragraphs 23-43 above.

23.     AUO denies the allegations in paragraph 45 that are directed to AUO. As to the remaining allegations in paragraph 45 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

24.     AUO denies the allegations in paragraph 46 that are directed to AUO. As to the remaining allegations in paragraph 46 that are directed to the co-defendants in this action, AUO

is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

25.    AUO denies the allegations in paragraph 47 that are directed to AUO.  As to the remaining allegations in paragraph 47 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

26.    AUO denies the allegations in paragraph 48 that are directed to AUO.  As to the remaining allegations in paragraph 48 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

<u>COUNT II</u>

27.    AUO refers to and incorporates herein its responses to paragraphs 23-48 above.

28.    AUO denies the allegations in paragraph 50 that are directed to AUO.  As to the remaining allegations in paragraph 50 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

29.    AUO denies the allegations in paragraph 51 that are directed to AUO.  As to the remaining allegations in paragraph 51 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

30.    AUO denies the allegations in paragraph 52 that are directed to AUO.  As to the remaining allegations in paragraph 52 that are directed to the co-defendants in this action, AUO

is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

31.     AUO denies the allegations in paragraph 53 that are directed to AUO. As to the remaining allegations in paragraph 53 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

## COUNT III

32.     AUO refers to and incorporates herein its responses to paragraphs 23-53 above.

33.     AUO denies the allegations in paragraph 55 that are directed to AUO. As to the remaining allegations in paragraph 55 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

34.     AUO denies the allegations in paragraph 56 that are directed to AUO. As to the remaining allegations in paragraph 56 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

35.     AUO denies the allegations in paragraph 57 that are directed to AUO. As to the remaining allegations in paragraph 57 that are directed to the co-defendants in this action, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

36.     AUO denies the allegations in paragraph 58 that are directed to AUO. As to the remaining allegations in paragraph 58 that are directed to the co-defendants in this action, AUO

is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

## COUNT IV

37.     AUO hereby refers to and incorporates herein its responses to paragraphs 23-58 above.

38.     AUO admits that it filed a complaint for patent infringement in the U.S. District Court for the Western District of Wisconsin. The complaint alleges LPL infringes the following U.S. patents owned by AUO: the '781 Patent, the '160 Patent, and the '629 Patent. As to any remaining allegations in paragraph 60, AUO is without sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

39.     The '781 Patent, entitled "Frame and Bezel Structure for Backlight Unit," was duly and legally issued on December 20, 2005. AUO is the owner of all rights, title, and interest in and to the '781 Patent. AUO denies that the '781 Patent is invalid.

40.     The '160 Patent, entitled "Liquid-Crystal Display, Liquid-Crystal Control Circuit, Flicker Inhibition Method, and Liquid-Crystal Driving Method," was duly and legally issued on August 17, 2004. AUO is the owner of all rights, title and interest in and to the '160 Patent. AUO denies that the '160 Patent is invalid.

41.     The '629 Patent, entitled "Array Substrate for Display, Method of Manufacturing Array Substrate for Display and Display Device Using the Array Substrate, was duly and legally issued on February 10, 2004. AUO is the owner of all rights, title and interest in and to the '629 Patent. AUO denies that the '629 Patent is invalid.

42.     AUO admits that it has asserted the AUO patents against LPL. The remaining allegations in paragraph 64 are legal assertions to which no answer or response is required.

<u>**COUNT V**</u>

43.  AUO hereby refers to and incorporates herein its responses to paragraphs 23-64 above.

44.  LPL has infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more of the claims of the '781 Patent, directly, contributorily, and/or by inducement, by making, using, selling and/or offering to sell in the United States, and/or importing into the United States liquid crystal display devices in violation of 35 U.S.C. § 271.

45.  LPL has infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more of the claims of the '160 Patent, directly, contributorily, and/or by inducement, by making, using, selling and/or offering to sell in the United States, and/or importing into the United States liquid crystal display devices in violation of 35 U.S.C. § 271.

46.  LPL has infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more of the claims of the '629 Patent, directly, contributorily, and/or by inducement, by making, using, selling and/or offering to sell in the United States, and/or importing into the United States liquid crystal display devices in violation of 35 U.S.C. § 271.

47.  AUO admits that it has asserted the AUO patents against LPL.  The remaining allegations in paragraph 69 are legal assertions to which no answer or response is required.

<u>**AFFIRMATIVE DEFENSES**</u>

Without conceding that any of the following necessarily must be pleaded as an affirmative defense, or that any of the following are not already at issue by virtue of the foregoing denials, and without prejudice to AUO's right to plead additional defenses as discovery into the facts of the matter warrants, AUO hereby asserts the following affirmative defenses.

### First Affirmative Defense

48.    As a First and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that the Amended Complaint fails to state a claim upon which relief may be granted and fails to set forth facts sufficient to state a claim for relief against AUO.

### Second Affirmative Defense

49.    As a Second and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that its products and processes have not infringed, are not now infringing, and are not threatening to infringe upon any valid and enforceable claim of the '274 Patent, the '321 Patent, and/or the '737 Patent, either literally or under the doctrine of equivalents.

### Third Affirmative Defense

50.    As a Third and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that it has neither directly or indirectly contributed to the infringement of, nor induced another to infringe the '274 Patent, the '321 Patent, and/or the '489 Patent.

### Fourth Affirmative Defense

51.    As a Fourth and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that the '274 Patent, the '321 Patent, and/or the '489 Patent are invalid for failure to comply with one, or more, of the requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

### Fifth Affirmative Defense

52.    As a Fifth and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that LPL's claims are barred by the equitable doctrine of laches and/or estoppel.

### Sixth Affirmative Defense

53.    As a Sixth and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that LPL is precluded from construing such patents to cover AUO's conduct and/or

products, and is further estopped from asserting infringement under the doctrine of equivalents, on the basis of the statements made during the prosecution of one or more of the '274 Patent, the '321 Patent, and/or the '489 Patent..

<b><u>Seventh Affirmative Defense</u></b>

54.     As a Seventh and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that Plaintiff's damages are barred and/or limited by the provisions of 35 U.S.C. § 271, 286 and/or 287.

<b><u>Eighth Affirmative Defense</u></b>

55.     As an Eighth and Separate Affirmative Defense to LPL's Counterclaims, AUO alleges that the '274 Patent, the '321 Patent, and/or the '489 Patent are unenforceable due to inequitable conduct, including, but not limited to, the allegations set forth in Counterclaim Six below, which are incorporated by reference herein.

<b><u>ADDITIONAL COUNTERCLAIMS AGAINST LG.PHILIPS LCD CO., LTD.</u></b>

By these Counterclaims and pursuant to Rules 12 and/or 13 of the Federal Rules of Civil Procedure, Plaintiff/Counterclaimant AU Optronics Corporation ("AUO") seeks injunctive and declaratory relief and damages, including treble or multiple damages, for patent infringement of U.S. Patent No. 6,734,944 ("the '944 Patent"), U.S. Patent No. 7,125,157 ("the '157 Patent"), and U.S. Patent No. 7,090,506 ("the '506 Patent) (collectively "the AUO Patents"), against Defendants LG.Philips LCD Co., Ltd. ("LPL").  AUO also seeks declaratory relief with respect to LPL's patent counterclaims.

<b><u>THE COUNTERCLAIM PARTIES</u></b>

56.     Plaintiff and Counterclaimant AUO is a corporation organized and existing under the laws of the Republic of China (Taiwan), with its principle place of business located in Taiwan.

57.    AUO is the owner of the AUO Patents.

58.    Defendant LG.Philips LCD Co., Ltd. ("LPL") alleges that it is a corporation organized and existing under the laws of the Republic of Korea, having its principal place of business at Seoul, Korea.

59.    Upon information and belief, LPL has committed and continues to commit acts of patent infringement within this judicial district by working in concert to make, use, sell, offer to sell, and/or import LCD modules, products, and systems containing such LCD modules in this judicial district that are covered by the AUO Patents.

60.    LPL claims to be the owner by assignment of United States Patent No. 5,905,274 ("the '274 Patent"), United States Patent No. 6,815,321 ("the '321 Patent"), and United States Patent No, 7,176,489 ("the '489 Patent") (collectively "the "LPL Patents").

61.    These Counterclaims are based upon and arise under the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*, and in particular §§ 271, 281, 283, 284 and 285.

62.    Additionally, these Counterclaims are under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Patent Laws of the United States, based upon an actual controversy between LPL and AUO regarding the validity and claims of the LPL Patents, and is intended to provide appropriate and necessary declaratory relief.

## JURISDICTION AND VENUE

63.    The Court has jurisdiction over the subject matter of these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

64.    This Court has jurisdiction over the Counterclaims for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, under the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a), and under 28 U.S.C. § 1331.

65.     This court has personal jurisdiction and venue over LPL because, *inter alia*, LPL submitted itself to the jurisdiction of this Court.

## Counterclaim Count One

### (Infringement of U.S. Patent No. 6,734,944)

66.     On May 11, 2004, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,734,944 entitled "Liquid Crystal Display" (the '944 Patent). AUO is the owner of all rights, title and interest in and to the '944 Patent. A copy of the '944 Patent is attached as Exhibit A.

67.     On information and belief, LPL has directly infringed, contributorily infringed, and/or actively induced infringement of the '944 Patent by making, using, importing, offering for sale, and/or selling in the United States LCD modules, products, and systems containing such LCD modules covered by one or more claims of the '944 Patent.

68.     On information and belief, the infringement of the '944 Patent by LPL has been and continues to be deliberate and willful, and such infringement will continue unless LPL is preliminarily and permanently enjoined by this Court.

69.     As a consequence of the infringement of LPL complained herein, AUO has been damaged and will continue to sustain damages by such acts in amount to be determined at trial and will continue to suffer irreparable loss and injury.

## Counterclaim Count Two

### (Infringement of U.S. Patent No. 7,125,157)

70.     On October 24, 2006, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,125,157 entitled "Backlight Unit and Liquid Crystal Display

Utilizing the Same" (the '157 Patent). AUO is the owner of all rights, title and interest in and to the '157 Patent. A copy of the '157 Patent is attached as Exhibit B.

71.    On information and belief, LPL has directly infringed, contributorily infringed, and/or actively induced infringement of the '157 Patent by making, using, importing, offering for sale, and/or selling in the United States LCD modules, products, and systems containing such LCD modules covered by one or more claims of the '157 Patent.

72.    On information and belief, the infringement of the '157 Patent by LPL has been and continues to be deliberate and willful, and such infringement will continue unless LPL is preliminarily and permanently enjoined by this Court.

73.    As a consequence of the infringement of LPL complained herein, AUO has been damaged and will continue to sustain damages by such acts in amount to be determined at trial and will continue to suffer irreparable loss and injury.

### Counterclaim Count Three

### (Infringement of U.S. Patent No. 7,090,506)

74.    On August 15, 2006, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,090,506 entitled "Signal Transmission Device Having Flexible Printed Circuit Boards" (the '506 Patent). AUO is the owner of all rights, title and interest in and to the '506 Patent. A copy of the '506 Patent is attached as Exhibit C.

75.    On information and belief, LPL has directly infringed, contributorily infringed, and/or actively induced infringement of the '506 Patent by making, using, importing, offering for sale, and/or selling in the United States LCD modules, products, and systems containing such LCD modules covered by one or more claims of the '506 Patent.

76.     On information and belief, the infringement of the '506 Patent by LPL has been and continues to be deliberate and willful, and such infringement will continue unless LPL is preliminarily and permanently enjoined by this Court.

77.     As a consequence of the infringement of LPL complained herein, AUO has been damaged and will continue to sustain damages by such acts in amount to be determined at trial and will continue to suffer irreparable loss and injury.

### Counterclaim Count Four

### (Declaratory Judgment of Invalidity of the '274 Patent, the '321 Patent, and the '489 Patent)

78.     AUO hereby incorporates paragraphs 56-65 above as though fully set forth herein.

79.     LPL has accused AUO of infringing the LPL Patents by filing its counterclaims in this action.  As such, there is substantial controversy between the parties having adverse legal interests.

80.     Claims of the '274 Patent are invalid for failure to satisfy one or more of the requirements for patentability set forth in Title 35 of the United States Code.

81.     Claims of the '321 Patent are invalid for failure to satisfy one or more of the requirements for patentability set forth in Title 35 of the United States Code.

82.     Claims of the '489 Patent are invalid for failure to satisfy one or more of the requirements for patentability set forth in Title 35 of the United States Code.

83.     Because LPL has asserted the LPL Patents against AUO, thereby creating an actual controversy, declaratory relief is both appropriate and necessary to establish that one or more of the claims of the '274, Patent, the '321 Patent, and the '489 Patent are invalid.

## Counterclaim Count Five

### (Declaratory Judgment of Non-Infringement of the '274 Patent, the '321 Patent, and the '489 Patent)

84.     AUO hereby incorporates paragraphs 56-65 and 78-83 above as though fully set forth herein.

85.     AUO has not infringed and does not infringe any claim of the '274 Patent, either literally or under the doctrine of equivalents.

86.     AUO has not infringed and does not infringe any claim of the '321 Patent, either literally or under the doctrine of equivalents.

87.     AUO has not infringed and does not infringe any claim of the '489 Patent, either literally or under the doctrine of equivalents.

88.     Because LPL maintains that AUO infringes the LPL Patents, thereby creating an actual controversy, a declaration of rights between LPL and AUO is both appropriate and necessary to establish that LPL has not infringed and does not infringe any claim of the '781 Patent, the '160 Patent, or the '629 Patent.

## Counterclaim Count Six

### (Declaratory Judgment of Unenforceability of the '274 Patent, the '321 Patent, and the '489 Patent)

89.     AUO hereby incorporates paragraphs 56-65 and 78-88 above as though fully set forth herein.

90.     The LPL Patents relate to a thin film transistor having a double-layered metal gate structure and relate to a method of making such a double-layered gate structure. The three LPL Patents, the '274 Patent, the '321 Patent, and the '489 Patent, share the same specification.

91.     The inventor Hyun-Sik Seo, the inventor Byung-Chul Ahn, and the prosecution counsel at Birch, Stewart, Kolasch and Birch, LLP, knew of prior art references disclosing a

15

thin film transistor having a double-layered metal gate that is the same or similar to the claimed double-layered metal gate of the LPL Patents, as well as the method of making such a double-layered metal gate, and, on information and belief, willfully and with the intent to deceive the U.S. Patent and Trademark Office ("USPTO"), refrained from disclosing such references to the USPTO.  Such prior art references include, but are not limited to, U.S. Patent No. 6,235,561 that was issued on May 22, 2001 (the "Seiki Reference"), and its parent U.S. Patent No. 5,811,835 that was issued on September 22, 1998.

92.     On information and belief, Inventor Seo, Inventor Ahn, and the prosecution counsel knew of the teachings of the Seiki Reference before filing, or during the prosecution of, the applications for the LPL Patents.  Inventor Seo, Inventor Ahn, and the prosecution counsel at Birch, Stewart, Kolasch & Birch, LLP filed, on October 25, 2001, an application that became U.S. Patent No. 6,573,127 (the "'127 Patent") with the USPTO.  The '127 Patent discloses the same or similar double-layered metal gate as the LPL Patents.  During the prosecution of the '127 Patent, the Examiner issued an office action on or about August 14, 2002, citing and discussing in detail the Seiki Reference.  The August 14, 2002 date of this office action predates the filing dates of the '489 Patent and the '321 Patent.

93.     The Seiki reference and its teachings were highly material to the patentability of the LPL Patents during their prosecution.  On information and belief, the Seiki Reference would have been viewed as important by a reasonable Examiner.  The Seiki reference is not cumulative of other art of record in the applications for the LPL Patents.  The Seiki Reference, alone or in combination with the other prior art references of record, would: i) establish a prima facie case of unpatentability of one or more claims of each of the LPL Patents; and/or ii) refute or is inconsistent with the  arguments made during the prosecution of the LPL Patents in favor

16

of their patentability. On information and belief, Inventor Seo, Inventor Ahn, and the prosecution counsel knew, or should have known, the high materiality of the Seiki Reference.

94.    On information and belief, Inventor Seo, Inventor Ahn, and the prosecution counsel knew of material information relating to and arising from the Examiner's rejections of claims that are substantially similar to the issued claims of the LPL Patents, and, willfully and with the intent to deceive the USPTO, refrained from disclosing such material information to the USPTO.

95.    The original claim 1 of the '274 Patent, as presented in the application that was filed on or about August 27, 1997, is substantially similar to claim 1 of the '489 Patent as issued.

96.    The original of claim 1 of the '274 Patent, as presented in the application that was filed on or about August 27, 1997, contains a number of limitations that are substantially similar to the limitations recited in the claims of the '321 Patent as issued.

97.    During the prosecution of the '274 Patent, the Examiner rejected the original claim 1 of the '274 Patent in view of U.S. Patent No. 5,156,986 (the "Wei Reference"), setting forth his rejections and reasoning in an Office Action as to how the Wei Reference renders the original claim1 invalid. The applicant amended the original claims to overcome the Examiner's rejections.

98.    On information and belief, Inventor Seo, Inventor Ahn, and the prosecution counsel, before and/or during the prosecution of the '489 Patent and the '321 Patent, knew of the prosecution history relating to claim 1 of the '274 Patent. The rejected claim is substantially similar to the claims pending before the Examiner for the '489 Patent. The rejected claim also includes various limitations that are substantially similar to the limitations

17

in claims pending before the Examiner for the '321 Patent. After learning of the Examiner's rejections, Inventor Seo, Inventor Ahn, and the prosecution counsel filed the '489 and '321 Patents and continued to prosecute them without disclosing these rejections. Inventor Seo, Inventor Ahn, and the prosecution counsel knew, or should have known, of the high materiality of these rejections to the patentability of the '489 Patent and '321 Patent.

99.    On information and belief, Inventors Seo and Ahn filed U.S. Application No. 09/243,556 on or about February 2, 1999 (the "'556 Application"), which was issued on January 22, 2002 as U.S. Patent No. 6,340,610 (the "610 Patent"). The original claim 9 of the '556 Application, which eventually issued as claim 1 of the '610 Patent, contains various limitations that are substantially similar to those in the independent claims of the '321 and '489 Patents as issued.

100.    During the prosecution of the '556 Application, the Examiner rejected the original claim 9 in separate office actions (dated September 6, 2000 and March 29, 2001) in view of various prior art references, including, but not limited to, GB2253742A, JP 05-315615, IBM Technical Disclosure Bulletin. The Examiner set forth in these office actions his rejections and reasoning as to how these references render the original claim 9 invalid. The applicant amended the original claim 9 to overcome the Examiner's rejections.

101.    On information and belief, Inventor Seo, Inventor Ahn, and the prosecution counsel, before and/or during the prosecution of the '489 Patent and the '321 Patent, knew of the prosecution history relating to claim 9 of '556 Application. The rejected claim contain limitations that are substantially similar to the claims pending before the Examiner for the '489 Patent and the '321 Patent. Inventor Seo, Inventor Ahn, and the prosecution counsel filed the application for the '489 Patent and the '321 Patent, and continued the prosecution without

18

disclosing these rejections raised by the Examiner during the prosecution of the '556

Application. Inventor Seo, Inventor Ahn, and the prosecution counsel knew, or should have

known, the high materiality of these rejections to the patentability of the '489 Patent and '321

Patent.

102.   An actual and justiciable controversy exists between the parties as to the

enforceability of the '274 Patent, the '321 Patent, and/or the '489 Patent. Declaratory relief is

both appropriate and necessary to establish that the '274, Patent, the '321 Patent, and/or the

'489 Patent are unenforceable.

103.   Because Inventor Hyun-Sik Seo, Inventor Byung-Chul Ahn, and/or the

prosecution counsel at Birch, Stweart, Kolasch and Birch, LLP failed to disclose material prior

art and/or material information to the USPTO with the intent to deceive the USPTO during the

prosecution of the LPL Patents, the '274 Patent, the '321 Patent, and/or the '489 Patent are

unenforceable due to inequitable conduct. AUO is entitled to a judicial declaration that the

'274 Patent, the '321 Patent, and/or the '489 Patent are unenforceable.

## EXCEPTIONAL CASE

104.   This is an exceptional case under 35 U.S.C. § 285 and, as such,

Plaintiff/Counterclaimant AUO is entitled to recover from LPL the attorneys' fees and costs

incurred in connection with this action.

## PRAYER FOR RELIEF

**WHEREFORE**, AUO respectfully requests that the Court:

A.     Dismiss LPL's Counterclaims with prejudice;

B.     Enter judgment in favor of AUO and declare that each of the claims of the '274

Patent, '321 Patent, and '489 Patent are invalid;

19

C.     Enter judgment in favor of AUO and declare that AUO has not infringed any claim of the '274 Patent, the '321 Patent, and '489 Patent either literally or under the doctrine of equivalents;

D.     Enter judgment in favor of AUO and declare that each of the '274 Patent, the '321 Patent, and '489 Patent is unenforceable;

E.     Enter judgment in favor of AUO and declare that the '944 Patent, the '157 Patent, and the '506 Patent are valid and enforceable;

F.     Enter judgment in favor of AUO and declare that LPL has infringed, actively induced infringement of, and contributorily infringed '944 Patent, the '157 Patent, and the '506 Patent;

G.     Preliminarily and permanently enjoy LPL from further infringement of '944 Patent, the '157 Patent, and the '506 Patent by unauthorized use of the inventions patented therein, by LPL and its officers agents, servants, employees, attorneys and all persons in active concert or participation with them;

H.     Award damages and prejudgment interest to AUO for the infringement of '944 Patent, the '157 Patent, and the '506 Patent;

I.     Declare that the infringement of '944 Patent, the '157 Patent, and the '506 Patent t by LPL is willful, and award treble damages to AUO as provided by 35 U.S.C. § 284;

J.     Declare that this is an exceptional case under 35 U.S.C. § 285 and award to AUO its attorneys' fees and costs; and

K.     Grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, AU OPTRONICS

CORPORATION respectfully demands a trial by jury on all issues so triable in this action.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*Karen L. Pascale*

July 10, 2007

Richard H. Morse (#531) [rmorse@ycst.com]
John W. Shaw (#3362) [jshaw@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
*Attorneys for AU Optronics Corporation*

OF COUNSEL:

PAUL HASTINGS JANOFSKY & WALKER LLP
Vincent K. Yip
Terry D. Garnett
Peter J. Wied
Jay C. Chiu
Hua Chen
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000

- and -

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Ron E. Shulman
Julie M. Holloway
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300

M. Craig Tyler
Brian D. Range
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, Texas 78759-8497
Telephone: (512) 338-5400

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on July 10, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Richard D. Kirk [rkirk@bayardfirm.com]
Ashley B. Stitzer [astitzer@bayardfirm.com]
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box. 25130
Wilmington, DE 19899-5130
(302) 655-5000
　*Attorneys for LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.*

Philip A. Rovner [provner@potteranderson.com]
David E. Moore [dmoore@potteranderson.com]
POTTER, ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
　*Attorneys for Chi Mei Optoelectronics Corporation*

I further certify that I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

### *By E-mail*

Gaspare J. Bono [gbono@mckennalong.com]
Matthew T. Bailey [mbailey@mckennalong.com]
R. Tyler Goodwyn, IV [tgoodwyn@mckennalong.com]
Lora A. Brzezynski [lbrzezynski@mckennalong.com]
Cass W. Christenson [cchristenson@mckennalong.com]
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, DC 20006
(202) 496-7500
　*Attorneys for LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.*

Kenneth R. Adamo [kradamo@jonesday.com]
Robert C. Kahrl [rckahrl@jonesday.com]
Arthur P. Licygiewicz [aplicygiewicz@jonesday.com]
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-3939
　*Attorneys for Chi Mei Optoelectronics Corporation*

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

July 10, 2007

Richard H. Morse (#531) *[rmorse@ycst.com]*
John W. Shaw (No. 3362) *[jshaw@ycst.com]*
Karen L. Pascale (No. 2903) *[kpascale@ycst.com]*
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone: 302-571-6600
  *Attorneys for AU Optronics Corporation*

# EXHIBIT A

US006734944B1

(12) **United States Patent**
Koseki et al.

(10) Patent No.: **US 6,734,944 B1**
(45) Date of Patent: **May 11, 2004**

(54) **LIQUID CRYSTAL DISPLAY**

(75) Inventors: **Toshihiko Koseki**, Himeji (JP);
**Hidefumi Yamashita**, Yamato (JP);
**Taro Hasumi**, Tokyo (JP); **Yuichi
Momoi**, Kamakura (JP); **Yoshinori
Shohmitsu**, Yamato (JP); **Tomohito
Johnai**, Yamato (JP)

(73) Assignee: **International Business Machines
Corporation**, Armonk, NY (US)

(*) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/558,819**

(22) Filed: **Apr. 26, 2000**

(30) **Foreign Application Priority Data**

Apr. 28, 1999 (JP) ............................................. 11-122923

(51) Int. Cl.$^7$ ........................................... G02F 1/1345
(52) U.S. Cl. ........................................ 349/155; 349/156
(58) Field of Search ................................. 349/155, 156,
349/157; 428/1.5

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,499,128 A | * | 3/1996 | Hasegawa et al. ........... | 349/155 |
| 5,978,061 A | * | 11/1999 | Miyazaki et al. ........... | 349/155 |
| 6,094,251 A | * | 7/2000 | Jones et al. ................. | 349/172 |
| 6,181,406 B1 | * | 1/2001 | Morimoto et al. ........... | 349/155 |
| 6,288,121 B1 | * | 9/2001 | Bader et al. ................. | 514/605 |
| 6,304,308 B1 | * | 10/2001 | Saito et al. ................. | 349/155 |
| 6,337,730 B1 | * | 1/2002 | Ozaki et al. ................. | 349/156 |

* cited by examiner

*Primary Examiner*—Kenneth Parker
(74) *Attorney, Agent, or Firm*—Robert M. Trepp; Anne V.
Dougherty

(57) **ABSTRACT**

In the liquid crystal display **10**, consisting of a first substrate
(**12**) and a second substrate (**14**) facing each other, either or
both of the first substrate (**12**) and the second substrate (**14**)
is/are disposed in a non-display region, the spacers **18**
consisting of a photosensitive resin regulating the cell gaps
**16** between both substrates 12 and 14, and liquid crystal **20**
sandwiched between the first substrate (**12**) and the second
substrate (**14**), either a dynamic hardness value or a plastic
deformation hardness value is within a fixed range.

4 Claims, 2 Drawing Sheets





FIG. 1

FIG.2A



FIG.2B

US 6,734,944 B1

1

# LIQUID CRYSTAL DISPLAY

## FIELD OF THE INVENTION

The present invention relates to a liquid crystal display, and more specifically, to a spacer for a liquid crystal display.

## BACKGROUND OF THE INVENTION

A liquid crystal cell of a liquid crystal display is formed by sealing a liquid crystal between 2 substrates. The thickness of this sealed liquid crystal layer, that is, a space between the substrates, is called a cell gap. Display unevenness is caused by partial thickness differentials of the liquid crystal layer when cell gaps are not uniform. Accordingly, spherical spacers called pearl spacers and the like or cylindrical spacers are used for providing uniform cell gaps between the substrates.

Since spacers are not fixed to substrates, but they are dispersed between two substrates, variations in the distribution (density) of spacers may result. As a result, small cell gaps where the spacers are less densely distributed may cause display unevenness. Furthermore, it is not desirable that screen flickering can be observed when watching liquid crystal cells on a large screen on the whole. Furthermore, although these spacers are invisible, they cause a problem that the spacers are in shadow when they are on the surface of the pixels, for example, in a case where the pixels represent black, and a black contrast sharply deteriorates due to the appearance of the spacers as white dots on the screen.

Therefore, various techniques for forming pillar-like spacers in predetermined positions by using a photosensitive resin have been suggested to improve the conventional method for manufacturing a liquid crystal display with spherical spacers dispersed. However, all of these techniques have some problems and none of them has been actually used.

For example, the Japanese Laid-Open Patent Publication No. 54-12066 discloses a method for regulating cell gap by scattering lots of first spacers formed of materials having a high melting point and by adding second spacer portions formed of materials having a relatively low melting point on the first spacers to fuse the second spacer portions with opposing panels. In this method, two kinds of spacers made of different materials are used, and each of them serves as a spacer and an adhesive to the opposing panel as well, but this method requires double deposition, which has turned out to be no good from both aspects of the cost and the productivity.

Further, the Japanese Laid-Open Patent Publication No. 60-164723 discloses a method for providing cell gaps by forming pillars made of electrical insulator on a liquid crystal driving element. Furthermore, the Japanese Laid-Open Patent Publication No. 56-25777 discloses a method for forming a cell gap by providing a spacer function to a portion where a semiconductor is provided. Since these methods are for further forming pillars on a thin film transistor (TFT) having protrusions on it or the like, the level differences of a foundation and positioning accuracy, which exerts an effect on the formation of gaps, made it difficult to form uniform cell gaps.

Further, the Japanese Laid-Open Patent Publication No. 56-38008 discloses a method for forming cell gaps by providing a plurality of spacer materials on an image non-display portion of pixels, which are thicker than semiconductor driving elements. The spacer materials disclosed in

2

this patent publication are highly hard inorganic matters such as metallic oxide, and in addition, a plurality of spacers per pixel are arranged in a liquid crystal display. For this reason, especially, in the case of a cell of 10 inches or more, the spacer having too high strength on the whole causes low-temperature bubbles. Specifically, when a liquid crystal display manufactured at room temperature is cooled down to an extreme low temperature during transportation or the like, cavities (vacuum bubble) are created inside the cell gaps because spacers in cell gaps do not shrink, even if the liquid crystals shrink. Because of this problem, this display cell is not suitable for a practical use.

Moreover, the Japanese Laid-Open Patent Publication No. 7-281195 discloses that about 5 $\mu$m-cell gaps are achieved by forming 2 to 3 $\mu$m of plural multi-layered second protrusion parts on the side of the color filter substrate (CF), forming 2 to 3 $\mu$m of plural first protrusion parts on the side of an array substrate by using a pigment dispersion resist, and then superimposing one substrate on another with their protrusions facing each other. In this method, desired cell gaps can be obtained according to the height of the protrusion parts of both array and CF-type substrates. However, the optical density gets higher because the first protrusion parts on the array substrate side also serve as a black matrix (BM). When a photosensitive pigment dispersion resin is used, there is an upper limit of height due to the use of a photo process. On the other hand, since the color filter of the CF laminate on the CF substrate side gets thinner, the second protrusion parts of the CF substrate side have an upper limit to their film thickness and there is also a limit to uniformity of heights obtained by the laminate.

An object of the present invention is to solve problems of unstable positioning of spherical spacers, etc. Another object of the present invention is to provide a liquid crystal display which can inhibit the generation of low-temperature bubbles and serve as a spacer formed of photosensitive resin materials which are resistive to local load.

## SUMMARY OF THE INVENTION

As a result of intensive studies to achieve these objects, the inventors have attained this invention. In the liquid crystal display according to the present invention, since spacers, which regulate cell gaps between the first and the second substrates facing each other, are formed on a predetermined position except a non-display region, or a pixel surface by using photosensitive resin, the spacers do not get behind the pixels. As a result, especially a black contrast can be improved. In addition, since a density of the spacers is substantially constant, uniform cell gaps can be provided, so that unevenness and flickering of the liquid crystal screen from both microcosmic and macrocosmic points of view. In the liquid crystal display of the present invention, characteristics and forms of spacers are set within a predetermined range. Therefore, spacers are shrinked when the liquid crystal display is cooled to a low temperature to shrink liquid crystals and then both substrates are bent convexly in an inward direction, so that no vacuum portions or low temperature bubbles are generated inside the cell gaps. Spacers can be elastically deformed when the liquid crystal screen is locally pressed by a finger or the like, and plastic deformation appears on the spacers when the liquid crystal screen is further strongly pressed. However, in the liquid crystal display of the present invention, the dimensions of the spacers can return to approximately original dimensions and the spaces between the cell gaps in the pressed portion can recover to constant spaces by preventing the spacer from being easily crashed by the pushing pressure and minimizing

US 6,734,944 B1

3

the residual distortion in plastic hysteresis when the pressing force is released.

### BRIEF DESCRIPTION OF THE DRAWINGS

Now, a preferred embodiment of the liquid crystal display according to this invention will be described in detail on the basis of accompanying drawings wherein:

FIG. 1 is an enlarged sectional view of a main part for illustrating an embodiment of the liquid crystal display according to the present invention; and

FIGS. 2A and 2B are a plan view and a cross sectional side view respectively illustrating an evaluation method for spacers formed in the liquid crystal display according to the present invention.

### DETAILED DESCRIPTION OF THE INVENTION

As shown in FIG. 1, a liquid crystal display 10 is formed from a matrix comprises at least an array substrate 12 and a color filter substrate 14 disposed facing each other, spacers 18 formed of photosensitive resin which regulates cell gaps 16 between the array substrate 12 and the color filter substrate 14, and a liquid crystal 20 sandwiched between both substrates 12 and 14. The array substrate 12 and the color filter substrate 14 may have well known structures and may be formed by a well known manufacturing method. A well known liquid crystal 20 can be used.

For example, in the array substrate 12, a TFT (thin film transistor) 24, a storage capacity 26, and pixel electrodes (display electrodes) 28 are arranged in a matrix form on a translucent substrate 22. On the other hand, the color filter substrate 14 is equipped with a color filter 32 whose primary colored portions are arranged on a translucent substrate 30 in the matrix form, a common electrode 36 and an alignment layer 38 where a protective coating layer 34 is above them. This color filter 14 can be equipped with a black matrix 40 which can increase shielding between colored portions (pixels) and improving contrast, if necessary.

Pillar-like spacers 18 are formed of photosensitive resin on the array substrate 12 formed by a publicly known manufacturing method. The pillar-like spacers 18 are formed in a non-display region which does not exert an influence on pixels and does not include at least the surface of the pixel electrodes 28, for example, such as on the gate electrode line or the source electrode line, and the like. Although the spacers 18 are preferably formed on a passivation layer consisting of SiNx and the like, which is formed on the area except the pixel electrodes of the array substrate 12, the passivation layer is not necessarily used as the foundation of the spacers 18 in consideration of a relation with resin employed for forming the spacers 18. The sign 42 represents a seal for sealing the crystal liquid 20 in the cell gaps 16.

As material for forming the spacers 18, photosensitive resin is employed and more preferably photosensitive resin that satisfies the following conditions is employed. Namely, a photosensitive resin for forming the spacers 18, whose dynamic hardness value (DH) is between 26 and 30 evaluated by the following formula, is selectively used:

DH=K×Pmax/hmax²

DH: dynamic hardness value (Kgf/mm²)

Pmax: maximum load (Kgf)

hmax: total maximum variation (mm) obtained by adding elastic deformation and plastic deformation

wherein a constant K represents a value obtained by the variation of an indentator inherent to the liquid crystal

4

display. This formula is derived by conducting a dynamic hardness test. Dynamic hardness used herein means hardness obtained when the load is sequentially varied to be extrapolated to a zero load and parameter means a target load. This dynamic hardness represents a function of depth to the hardness because this dynamic hardness varies the load sequentially.

The spacers 18, whose dynamic hardness value (DH) is in the range from 26 to 30, is neither hard nor soft. When the dynamic hardness value (DH) is below 26, there is a wide variation in the cell gaps after the force is applied from the outside of the liquid crystal display and this causes a problem that image quality is easily changed. Further, when the dynamic hardness value (DH) exceeds 30, undesired low-temperature bubbles are generated in the liquid crystal when the liquid crystal display is cooled down to a low temperature.

Also, the spacers 18 are preferably formed of photosensitive resin, which satisfies the following conditions: more specifically, photosensitive resin for forming the spacers 18, whose plastic deformation hardness value (HV) is between 38 and 46 obtained by the following formula, is selectively used:

HV=K×Pmax/hr²

HV: plastic deformation hardness (Kgf/mm²)

Pmax: maximum load (Kgf)

hr: variation (mm) when the tangent in the maximum variation point of a curb has no load in the case of unloading.

wherein a constant K represents a value obtained by the variation of an indentator inherent to the liquid crystal display.

Further, this formula determines a tangent in the maximum different point (same as the maximum different point in loading) of the curve when unloading and the hardness corresponding to Vickers' hardness by separating the plastic variation from its inclination. More specifically, this is led by the plastic hysterisis curve obtained by a compression variation measurement against the load. This plastic deformation hardness value (HV) may be a little different from actual Vickers' value due to the shape of the indentator or the like.

The plastic deformation hardness value (HV) of the spacers 18 are preferably in the range from 38 to 46. When their plastic deformation hardness value (HV) is below 38, permanent image quality defects occur because the dimensions of the spacers cannot return to the dimensions before deformation due to large plastic deformation variation caused by the small cell gaps when the external force is applied to the liquid crystal display. When the plastic deformation hardness value (HV) exceeds 46, undesired low-temperature bubbles can be generated.

If the spacers 18 meet either of the conditions of hardness value (DH) or plastic deformation hardness value (HV) evaluated by the above formula, certain effects can be obtained, but it is desirable to meet both conditions.

Since the spacers 18 are disposed in the nondisplay region on the array substrate 12, it does not affect the image quality, however, when the spacers 18 are few in number, namely, when the total lower bottom area of the pillar-like spacers 18 is small, it is difficult to keep the cell gaps 16 nearly constant due to weak bearing capacity of the color filter substrate 14. In addition, when a local load is imposed on the color filter substrate 14, the spacers 18 can be easily broken. On the contrary, when the spacers 18 are large in number, the strong bearing capacity of the color filter substrate 14 allows the cell gaps 16 to keep constant, and therefore, the spacers 18 can sufficiently carry the local load imposed on the color

US 6,734,944 B1

5

filter substrate 14, however, when the liquid crystal 20 shrinks by exposing the liquid crystal display 10 to a low temperature, a vacuum portion (low-temperature bubbles) is generated. Therefore, it is important that the number of the spacers 18 is appropriate for the array substrate 12 or the color filter substrate 14, namely, appropriate area, the occupancy ratio of the spacers 18 in the substrate is important.

Where the occupancy ratio (column occupancy ratio) is defined as the ratio of the pixel area that is made up by the lower bottom area of the column (spacers 18) constituting the cell gaps 16 forms against the pixel area, the column occupancy ratio is expressed as follows:

Column occupancy ratio=(Lower bottom area of column×column density/pixel area)×100

wherein column density means the number of the columns constituting the cell gaps per pixel can be represented by the following formula:

Column density=total number of columns/total number of pixels

When the study results of the inventors of the present invention show that the column occupancy ratio expressed by the above formula ranges from 0.05 to 0.86%, the pillar-like spacers 18 can sufficiently carry the local load without being crushed. Further, even if it is exposed to a low temperature, no low-temperature bubbles are generated inside the cell gaps 16 because the spacers 18 contract in response to a negative pressure generated in the cell gaps 16 as the liquid crystal contracts.

When the surface that is parallel to the pillar-like spacers 18 is rectangular in shape, the ratio of one side of the upper bottom of the spacers 18 to one side of the lower bottom is between 50 and 90%. Alternatively, when the surface is circular in shape, the ratio of the diameter of the upper bottom of the spacers 18 to that of the lower bottom is preferably between 50 and 90%. When the ratio of two sides of the spacers 18 or the ratio of the diameters is within the range of 50 to 90% as described above, the following troubles and problems can be minimized. However, if the ratio of two sides of the spacers 18 or the ratio of the diameters is below 50%, the numerical aperture in the liquid crystal display sharply drops. If the ratio of two sides of the spacers or the ratio of the diameters exceeds 90%, the columns tend to be tapered in the opposite direction in the process of forming the columns, which leads to collapse of the columns in the subsequent processes for forming cell gaps.

The spacers 18 are formed in the shape of prism or cylinder by a photolithography method and then they are heat treated. However, since side-wall portions of the spacers 18 are not linearly etched, they are distorted as shown in FIG. 2(b). Especially, an upper bottom portion 44 is a little curbed, and each measured value varies every time the length or the diameter of one side of the upper bottom 44 is measured, or when measurement is carried out by different people, and thus the measured value is unstable. On the other hand, a tangent line 46 which is tangent to the upper bottom 44 can be drawn or the highest position of the upper bottom 44. The position of the tangent line 46 is stable and no difference is caused by different measurers.

Measuring method is as follows: first, the tangent line 46 is drawn on the upper bottom 44 of the spacers 18 by using an enlarged cross-sectional photo of the spacers and then the length D of one side of a lower bottom 48 in the same direction as the tangent line 46 is measured. Next, the spacing (height) H between the lower bottom 48 (substrate

6

22) of the spacers 18 and the tangent line 46 of the upper bottom 44 is measured. The dimensions obtained by multiplying this height H by certain constant C below 1 such as 0.9 is defined as the height of the upper bottom (C×H). A line X parallel to the substrate 22 is drawn on that position, and the spacing between the two points of intersection of the line X and an outline 50 of the spacers 18 (side surface) is defined as the dimensions of the upper bottom. Etching is controlled, so that the ratio of the length of the upper bottom to that of the lower bottom obtained in this manner can be in the range of 50 to 90%. The ratio of the length of the upper bottom to that of the lower bottom varies according to the value of the constant C multiplying the height H of the upper bottom. The above range of 50 to 90% is the value to be obtained when the constant C is set at 0.9.

Next, the elastic coefficient of the spacers 18 in the liquid crystal display according to the present invention is preferably within the range from 100 to 500 Kg/mm². When the elastic coefficient is within this range, the spacers 18 are not easily broken due to the local load. Even when the spacing of the cell gaps 16 shrinks due to the shrinkage of the crystal liquid 20 caused by a fall of the temperature, and compression force is applied to the spacers 18, no low-temperature bubbles are generated because the spacers sufficiently shrink.

Furthermore, the linear expansion coefficient of the spacers 18 in the liquid crystal display 10 according to the present invention is preferred to be nearly equal to the volume expansion coefficient per unit area. The liquid crystal display 10 is exposed to various temperatures depending on work environments or during transportation. The temperature ranges 40° C. to –20° C. Accordingly, if the linear expansion coefficient of the spacers 18 is far larger than that of the volume expansion of the liquid crystal 20 per unit area, the expansion of the spacers 18 may cause a vacuum space inside the cell gaps 16 when the liquid crystal display 10 is exposed to a high temperature. On the contrary, if the linear expansion coefficient of the spacers 18 is far smaller than that of the volume expansion of the liquid crystal 20 per unit area, the shrinkage of the liquid crystal 20 may cause low-temperature bubbles because the liquid crystal 20 is more shrinkable than the spacers 18 when the liquid crystal display 10 is exposed to a low temperature. For this reason, the linear expansion coefficient of the spacers 18 is preferred to be nearly equal to that of the volume expansion of the liquid crystal 20 per unit area or be an approximate value to the volume expansion coefficient.

The spacers 18 having various properties have thus been described above, however, it is sufficient that the properties of the spacer applied to the liquid crystal display according to the present invention meet at least one of the requirements. The spacer which meets two or more requirements is most desirable. A JNPC-43 (manufactured by JSR) can be taken as an example of a photosensitive resin meeting these requirements, but spacers are not limited to them. The target properties may be obtained by controlling baking conditions of the photosensitive resin.

Further, when the target properties of spacers are not obtained by single photosensitive resin, various filling materials can be mixed with the photosensitive resin to obtain the properties. It is desirable that the photosensitive resin is colored a suitable color, such as black, etc. Furthermore, the shape of the surface parallel to the substrate of the spacers formed by a photosensitive resin can be circle, oval figure, ellipse, square, rectangle, triangle, or other polygons and so on, but it is not especially limited.

The spacers are preferred to be formed on either of the array substrate or the color filter substrate, which is not

US 6,734,944 B1

7

especially limited. The spacers may be formed on both the array and the color filter substrates, which is not limited at all.

Furthermore, spacers can be formed on an alignment layer or the alignment layer can be formed over the spacers. Thus, any and all modifications, variations or equivalent arrangements can be made to the embodiments on the basis of knowledge of those skilled in the art without departing from the scope of the invention.

An array substrate was prepared by using a glass substrate in accordance with a conventional manufacturing method. To form pillar-like spacers on this array substrate, a passivation layer made of SiNx is formed as a foundation except pixel electrodes. JNPC-43 (produced by JSR), as a photosensitive resin layer, was evenly applied to the passivation layer to form a film having a thickness of 5.5 $\mu$m and prebaked at 120° C. for 3 minutes.

Next, a photomask, which is so set that spacers have the column occupancy ratio of 0.19% and are arranged in a non-display region, and a light source without filter (broad band) were employed to expose the prebaked substrate to light with 300 mJ of energy. Using a 0.2% TMAH aqueous solution (manufactured by Tokyo Ohka Kogyo) as a developer, development was conducted at room temperature for 60 seconds. After that, baking was carried out at 230° C. for 20 minutes to form spacers.

The physical value of the spacer obtained was checked by using a thin layer hardness tester (produced by Elionix) ENT-1100. As a result, its dynamic hardness value DH was 28 and its plastic deformation hardness value HV was 44.

The array substrate, on which spacers are formed, and a color filter substrate separately formed in accordance with a conventional process were employed to constitute a liquid crystal display in the process eliminating the distribution process of ball-like spacers from the conventional process. A local load and low temperature bubbles of the obtained liquid crystal display were evaluated.

The evaluation of the local load is as follows: firstly, a cell gap on a measuring point is measured and the obtained value is defined as the cell gap initial value. Secondly, a metal ball having a diameter of 3 mm is placed on the surface of the color filter substrate on the measuring point, and then the cell gap on the measuring point is measured after applying specific load (10 Kgf) to the metal ball. The difference between the measured value and the initial value is defined as the "crushed size". The results of the measurements are shown in Table 1.

To evaluate low-temperature foaming, the liquid crystal display device manufactured at a room temperature was left in the environment at −20° C. and it was observed whether or not vacuum bubbles were generated. The results of the observation are shown in Table 1.

TABLE 1

| | Local load Crushed size (m) | Vacuum bubbles in Low-temperature foaming |
|---|---|---|
| Example | 0.17 | None |
| Comparative Example | 0.27 | None |

## Comparative Example

As a comparative example, conventional ball-like spacers were sprayed on identical array and color filter substrates used for an example to prepare a liquid crystal display. Local load and low-temperature foaming of the obtained liquid

8

crystal display of conventional structure was evaluated in the same manner as the Example. The results of the evaluation are shown in Table 1.

As a result of evaluation made by comparing the Example and the Comparative Example, it was confirmed the liquid crystal display according to the Example had the same performance as or a more excellent performance than the liquid crystal display manufactured using ball-like spacers.

The spacers of the liquid crystal display according to the present invention are not only formed on a predetermined portion by a photosensitive resin, but also have physical value or form, such as predetermined hardness value and plastic deformation hardness value, etc. Therefore, the spacers return to the previous state without being destroyed due to local load, so that the cell gaps can be kept nearly constant. Even if the liquid crystal display is exposed to a low temperature, neither vacuum portions inside the cell gaps nor low-temperature bubbles will be generated because the spacers get shrinked by external pressure or the like as the liquid crystal inside the cell gaps shrink.

Having thus described the invention, what is claimed is:

1. A liquid crystal display comprising:

first and second substrates each having a display and a non-display region and being disposed to face each other;

a plurality of columns each comprising a spacer disposed in the non-display region of at least one of the first and the second substrates and being formed of photosensitive resin which regulates a cell gap between the first and the second substrates; and

liquid crystal sandwiched between the first and the second substrates,

wherein each of said spacers has a dynamic hardness value (DH) from 26 to 30, which is obtained by the following formula:

$$DH = K \times Pmax/hmax^2,$$

wherein DH is dynamic hardness, K is a constant value assigned to the indentator used to test the liquid crystal display, Pmax is maximum load, and hmax is the total maximum variation obtained by adding the measured elastic deformation and plastic deformation under load,

and wherein each of said spacers has a hardness value of plastic deformation (HV) from 38 to 46, which is obtained by the following formula:

$$HV = K \times Pmax/hr^2,$$

wherein HV is hardness of plastic deformation, K is a constant value assigned to the indentator used to test the liquid crystal display, Pmax is maximum load, and hr is measured variation when the tangent in the maximum variation point of a curb has no load in the case of unloading.

2. The liquid crystals according to claim 1 wherein for a rectangular spacer, the length of one side of the upper spacer surface is 50 to 90% smaller than the length of one side of the lower spacer surface and wherein for a circular spacer, the diameter of the upper spacer surface is 50 to 90% smaller than the diameter of the lower spacer surface.

3. The liquid crystal display according to claim 1 wherein said plurality of columns have column occupancy ratio from 0.05 to 0.86%, which is expressed as follows:

Column occupancy ratio=(Lower bottom area of column×column Density/pixel)×100

Column density: Total number of columns/total number of pixels.

US 6,734,944 B1

9

4. A method for providing a liquid crystal display comprising the steps of:

disposing a first and second substrate facing each other, said first and second substrates having a display and a non-display region;

selecting a photosensitive resin to regulate a cell gap between the first and the second substrate; .

wherein said selecting of a photosensitive resin comprises choosing a photosensitive resin based on at least one of the group consisting of:

(a) a dynamic hardness value from 26 to 30, which is obtained by the following formula:

$$DH = K \times Pmax / hmax^2,$$

wherein DH is dynamic hardness, K is a constant value assigned to the indentator used to test the liquid crystal display, Pmax is maximum load, and hmax is the total maximum variation obtained by adding the measured elastic deformation and plastic deformation under load;

(b) a hardness value of plastic deformation (HV) from 38 to 46, which is obtained by the following formula:

$$HV = K \times Pmax / hr^2,$$

wherein HV is hardness of plastic deformation, K is a constant value assigned to the indentator used to test the liquid crystal display, Pmax is maximum

10

load, and hr is measured variation when the tangent in the maximum variation point of a curb has no load in the case of unloading;

(c) an elastic coefficient from 100 to 500 kg/mm²; a linear expansion coefficient which is nearly equal to the coefficient of volume expansion per unit area of the liquid crystal;

(d) wherein for rectangular spacers, the length of one side of the upper spacer surface is 50 to 90% smaller than the length of one side of the lower spacer surface and wherein for circular spacers, the diameter of the upper spacer surface is 50 to 90% smaller than the diameter of the lower spacer surface; and

(e) a column occupancy ratio from 0.05 to 0.86%, which is expressed as follows:

Column occupancy ratio=(Lower bottom area of column×column density/pixel area)×100

Column density: Total number of columns/total number of pixels;

placing spacers comprising said photosensitive resin between the first and second substrates, said spacers being placed in the non-display region of at least one of the first and the second substrates; and

providing liquid crystal between the first and the second substrates.

* * * * *

# EXHIBIT B



US007125157B2

(12) **United States Patent**
Fu et al.

(10) Patent No.: **US 7,125,157 B2**
(45) Date of Patent: **Oct. 24, 2006**

(54) **BACKLIGHT UNIT AND LIQUID CRYSTAL DISPLAY UTILIZING THE SAME**

(75) Inventors: **Shih-Che Fu**, Chiayi (TW); **Ting-Shih Hsu**, Taoyuan (TW); **Juei-Lung Huang**, Changhua (TW)

(73) Assignee: **AU Optronics Corp.**, Hsinchu (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 121 days.

(21) Appl. No.: **10/902,914**

(22) Filed: **Jul. 30, 2004**

(65) **Prior Publication Data**
US 2005/0254236 A1    Nov. 17, 2005

(30) **Foreign Application Priority Data**
May 13, 2004    (TW) ................................ 93113451 A

(51) Int. Cl.
*F21V 7/04*    (2006.01)

(52) U.S. Cl. ...................... 362/632; 362/630; 362/633; 349/58

(58) Field of Classification Search .............. 362/632, 362/633, 634; 349/58
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,175,396 B1 * 1/2001 Kim et al. ..................... 349/58

| | | | |
|---|---|---|---|
| 6,773,127 B1 * | 8/2004 | Kao | 362/627 |
| 6,835,961 B1 * | 12/2004 | Fukayama | 257/84 |
| 6,847,417 B1 * | 1/2005 | Kim | 349/58 |
| 2002/0024623 A1 * | 2/2002 | Kim et al. | 349/58 |
| 2005/0243238 A1 * | 11/2005 | Cha et al. | 349/58 |

FOREIGN PATENT DOCUMENTS

| TW | 449048 | 8/2001 |
|---|---|---|
| TW | 552440 | 9/2003 |

* cited by examiner

*Primary Examiner*—Ali Alavi
*Assistant Examiner*—Hargobind S. Sawhney
(74) *Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley

(57) **ABSTRACT**

A backlight unit for a liquid crystal display. The backlight unit comprises a frame, a first supporting portion, a second supporting portion, and a film. The film comprises a first constraining portion and a second constraining portion. The film is positioned on the frame by the first and the second supporting portion passing through the first and the second constraining portion, respectively. When the frame is disposed in a first position, the first supporting portion partially contacts an inner wall of the first constraining portion for positioning the film. When the frame is disposed in a second position, the second supporting portion partially contacts an inner wall of the second constraining portion for positioning the film. An LCD utilizing the backlight unit is also disclosed.

23 Claims, 11 Drawing Sheets



200



FIG. 1A  (RELATED ART)



FIG. 1B  (RELATED ART)

U.S. Patent      Oct. 24, 2006      Sheet 3 of 11      US 7,125,157 B2



FIG. 1C  (RELATED ART)

200



FIG. 2A



FIG. 2B



FIG. 3A



FIG. 3B



FIG. 3C



FIG. 4A



FIG. 4B



FIG. 4C



FIG. 4D

US 7,125,157 B2

1

## BACKLIGHT UNIT AND LIQUID CRYSTAL DISPLAY UTILIZING THE SAME

### BACKGROUND

The invention relates to a backlight unit and a liquid crystal display, and in particular to a backlight unit with a film positioning structure.

Liquid crystal displays are used in a variety of electronic devices, including personal digital assistant (PDA), note-book and desktop computer monitors, mobile phones, and TVs. Some liquid crystal displays are rotatable between different angles, such as, from 0° to 90°, 180°, or 270°. Larger panels, however, causes weight to increase accordingly, incurring a load problem during rotation.

FIG. 1A is a schematic view of a conventional backlight unit 10A for a liquid crystal display, disclosed in Taiwan patent No. 449048. In FIG. 1A, the backlight unit 10A comprises at least one light source (not shown), a plurality of optical films 120, a frame 15, and a fixing structure for the optical films 120. The light source is disposed between the optical films 120 and the frame 15. Light emitted by the light source passes through the optical films 120 such as a diffusion sheet, a prim sheet, and the like, thereby uniformly distributing the light. Note that FIG. 1A eliminates the upper and lower housings and the panel to clearly show the backlight unit 10A.

Extended portions 121, 122, 123, and 124 extend from a periphery of each optical film 120. Each extended portion 121, 122, 123, and 124 comprises holes 121a, 122a, 123a, 124a in the centers thereof. The frame 15 comprises four grooves 151, 152, 153, and 154, respectively corresponding to the extended portions 121, 122, 123, and 124. Protrusions 151a and 152a are respectively formed in the grooves 151 and 152, and hooks 153a and 154a are respectively formed in the grooves 153 and 154. When fixing the optical films 120 to the frame 15, the protrusions 151a and 152a and the hooks 153a and 154a pass through the holes 121a, 122a, 123a, 124a of the extended portions 121, 122, 123, and 124 such that the extended portions 121, 122, 123, and 124 are respectively disposed in the grooves 151, 152, 153, and 154. Thus, the optical films 120 are securely fixed in the frame 15.

Although the films 120 are securely fixed in the frame 15, manufacturing processes, such as, modeling of the grooves and fixing elements such as hooks and protrusions is complicated. The capital cost is thus increased. Furthermore, if temperature varies, the optical films 120 may expand or contract. As a result, stress is concentrated at the four fixing points at corners of the films 120; hence, Mura defects occur accordingly.

Taiwan patent No. 552440 attempts to solve the above mentioned problem. The backlight module 10B has an improved fixing structure for the optical films to prevent Mura defects. As shown in FIGS. 1B and 1C, the optical films 120 are disposed above the frame 15b. Only one edge of each optical film 120 comprises an extended portion 125 with a hole 125b formed thereon. Before assembling the optical films 120, a jig or other tool is required to fix each optical film 120 to align the extended portion 125 to a groove 150 of the frame 15b. After the optical films 120 are installed on the frame 15b, another fixing element such as a pin 120a and fixing base 120b are required to secure the optical films 150 thereon. Although the optical films 120 are securely fixed, additional time is required for the installing and detaching process. Moreover, alignment is difficult and requires additional alignment tools and jigs.

2

Furthermore, when positioning at different angles, for example, rotating the liquid crystal display to 180°, all the weight of the optical films 120 are concentrated at the single fixing point P. Since the fixing position is asymmetrical, during expansion and contraction of the films, stress is concentrated on the fixing point P, thus causing deformation of the optical films 120. This also results in Mura defects and uneven optical efficiency.

### SUMMARY

Thus, an embodiment of the invention provides a backlight unit for a liquid crystal display. The backlight unit includes a frame, a first supporting portion, a second supporting portion, and a film. The film comprises a first constraining portion and a second constraining portion. The film is positioned on the frame by the first and the second supporting portion passing through the first and the second constraining portion, respectively. When the frame is disposed in a first position, the first supporting portion partially contacts an inner wall of the first constraining portion for positioning the film. When the frame is disposed in a second position, the second supporting portion partially contacts an inner wall of the second constraining portion for positioning the film. An LCD utilizing the backlight unit is also disclosed.

The first constraining portion comprises a hole or a groove, and the second constraining portion comprises a hole or a groove.

The first constraining portion and second constraining portion are respectively formed on opposite edges of the film.

The backlight unit further comprises a third supporting portion and a fourth supporting portion disposed on the frame, and the film further comprises a third constraining portion and a fourth constraining portion respectively formed on opposite corners of the film; and the third supporting portion and the fourth supporting portion pass through the first constraining portion and the second constraining portion, respectively.

The film further comprises a third constraining portion and a fourth constraining portion respectively formed on adjacent corners of the film. The third supporting portion and the fourth supporting portion pass through the first constraining portion and the second constraining portion, respectively.

The first constraining portion and the second constraining portion are respectively formed on opposite corners of the film or on adjacent corners of the film.

The first and second constraining portions are symmetrically arranged with respect to a center point of the film.

When the frame is disposed in the second position, a first gap is formed between the first supporting portion and the first constraining portion, and the first gap is an allowance for film expansion or contraction due to temperature variation. When the frame is disposed in the first position, a second gap is formed between the second supporting portion and the second constraining portion, and the second gap is an allowance for film expansion or contraction due to temperature variation.

The first supporting portion and the second supporting portion each comprises a protrusion, a cylinder, or a cuboid.

The first and the second constraining portions are circular, elliptical, rectangular, rectangular with rounded corners, or polygonal.

When the frame is disposed at the first position, the first constraining portion and the first supporting portion con-

US 7,125,157 B2

3

strain a movement range of the film in a direction perpendicular to a gravity-acting direction, and the frame and the first supporting portion constrain the movement range of the film in an extending direction of the first supporting portion.

Furthermore, when the frame is disposed at the second position, the second constraining portion and the second supporting portion constrain a movement range of the film in a direction perpendicular to o gravity-acting direction, and the frame and the second supporting portion constrain the movement range of the film in an extending direction of the second supporting portion.

In an embodiment, when the first constraining portion is elliptical, and when the frame moves to the first position or the second position, a long axis of the elliptical first constraining portion corresponds to a direction of the weight of the frame pulling downwards, and a movement range of the first supporting portion is constrained by a short axis of the elliptical first constraining portion.

The frame further comprises a lamp holder, and the first supporting portion and the second supporting portion extend from the lamp holder toward the film.

The invention also provides an LCD utilizing the backlight unit.

A detailed description is given in the following embodiments with reference to the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention can be more fully understood by reading the subsequent detailed description and examples with references made to the accompanying drawings, wherein:

FIG. 1A is a schematic exploded view of a conventional backlight unit of a liquid crystal display disclosed by Taiwan patent No. 449048;

FIG. 1B is a schematic exploded view of a conventional backlight unit of a liquid crystal display disclosed by Taiwan patent No. 552440;

FIG. 1C is a local enlarged view of FIG. 1B;

FIG. 2A is a schematic of a liquid crystal display with a backlight unit of an embodiment of the invention;

FIG. 2B is a cross section of FIG. 2A along line i—i according to an embodiment of the invention;

FIG. 3A is a cross section of FIG. 2A along line ii—ii of a first embodiment of the invention, wherein the films and the supporting portions are connected at a first position;

FIG. 3B is another schematic plan view of the structure related to FIG. 3A when the films and the supporting portions are at a second position;

FIG. 3C is a schematic plan view of a variation of the first embodiment;

FIG. 4A is a schematic view of the combinations of the films and the supporting portions according to the second embodiment of the invention in a first position;

FIG. 4B is another schematic view of the structure related to FIG. 4A when the films and the supporting portions are at a second position;

FIG. 4C is another schematic view of the structure related to FIG. 4A when the films and the supporting portions are at a third position; and

FIG. 4D is another schematic view of the structure related to FIG. 4A when the films and the supporting portions are at a fourth position.

4

DETAILED DESCRIPTION

FIG. 2A is a schematic perspective view of a liquid crystal display 200 of an embodiment of the invention. FIG. 2B is a cross section of FIG. 2A along line i—i according to an embodiment of the invention.

The liquid crystal display 200 comprises a housing 30 and a backlight unit 10 disposed therein. The backlight unit 10 comprises a frame 15, a plurality of optical films 12, and a pair of supporting portions $P_1$, as shown in FIG. 2B. Each optical film $12a$ comprises a pair of holes $H_1$. Note that in FIG. 2B only a corresponding pair of the hole $H_1$ and the supporting portion $P_1$ are visible. The holes are referred to as constraining portions as they constrain the movement range of the supporting portions. The holes are formed along the gravity-acting directions of the frame 15 and the housing 30.

The supporting portion $P_1$ comprises plastics, metal or other materials. The supporting portion $P_1$ protrudes from the frame 15, correspondingly passing through the hole $H_1$ on the optical films 12 to position optical films 12 on the frame 15. Since the embodiments of the invention focus on a positioning structure of the optical films 12 in the backlight unit 10, other elements of the backlight unit 10 and liquid crystal display 200 are omitted.

In FIG. 2A, the symbols "I, J, K" represent fixed orthogonal coordinates. The liquid crystal display 200 is assumed to be disposed on a plane IJ according to the coordinates IJK. The plane IJ is parallel to the gravity-acting direction. Other movable coordinates XYZ move or rotate with the liquid crystal display 200. The coordinates XYZ defines the three-dimensional shape of the liquid crystal display 200. Thus, the axis X corresponds to the length of the optical films 12 or the frame 15. The axis Y corresponds to the width of the optical films 12 or the frame 15. The axis Z corresponds to an extending direction of the supporting portion $P_1$ of the frame 15 through the hole $H_1$ on the optical films 12.

In the following embodiments, the liquid crystal display 200 may rotate according to the fixed coordinates IJK on a plane IJ about the axis K. A detailed description of different positions of the liquid crystal display 200 and various combinations of the frame 15 and the optical films 12 is provided in the following.

FIGS. 3A and 3B are plan views of the optical films and the supporting portions of a first embodiment of the invention. Note that FIG. 3A is a cross section of FIG. 2A along line ii—ii, eliminating other elements in the backlight unit 10. FIG. 3B is a schematic view of a variation of FIG. 3A.

In FIG. 3A, the optical films 12 are connected to the frame (not shown) via the supporting portions $P_1$ at a first position. FIG. 3B shows the optical films 12 at a second position. The first position is referred to as an initial position of the housing 30, suspended on a plane IJ such that the axis Y of the optical films 12 corresponds to the axis J. The second position is in a suspended position when the housing 30 rotates with respect to the axis K from the first position to 180°.

The first and second supporting portions $P_1$ and $P_2$ penetrating the first and second holes $H_1$ and $H_2$, respectively, thereby fixing the optical films 12 on the frame 15, are more clearly shown in the cross sectional view in FIG. 2B. Additionally, the frame 15 comprises a lamp holder (not shown), and the supporting portions extend from the lamp holder and protrude from the frame 15 to support the optical films 12.

The optical films 12 comprise a first edge 21, a second edge 22, and a central point $C_0$. The first and the second edges 21 and 22 are disposed opposing each other. The

US 7,125,157 B2

5

central point $C_0$ is the geometric center of the optical film 12. Axes $C_X$ and $C_Y$ intersect each other at the central point $C_0$. Specifically, the axis $C_Y$ passes through both supporting portions $P_1$ and $P_2$. The first and the second holes $H_1$ and $H_2$ are symmetrical with respect to the central point $C_0$. The first and the second holes $H_1$ and $H_2$ are located in vicinity of the first edge 21 and the second edge 22, respectively. That is, the holes are formed on the periphery of the optical films 12. Moreover, when the first and second holes $H_1$ and $H_2$ are elliptical, and the frame 15 moves to the first position or the second position, the long axes of the elliptical first and second holes correspond to the axis $C_Y$ with respect to the axis $C_X$, and movement range of the first supporting portion is constrained by a short axis of the elliptical first hole. Note that the axis $C_Y$ is parallel to the gravity-acting direction of the optical films 12.

When the frame 15 is disposed at the first position (FIG. 3A), the first edge 21 is an upper edge of the optical film 12. The second edge 22 is a lower edge. Due to the weight of the optical film 12, the first supporting portion $P_1$ partially contacts an inner wall S1 of the first hole $H_1$ to position the optical film 12.

The symbol "$G_1$" represents the dimension of a first gap, which is the remaining portion of the first hole $H_1$ subtracted from the first supporting portion $P_1$. The size of the first gap $G_1$ is determined by the thermal expansion coefficient of the optical film 12, panel temperature, room temperature, manufacturing tolerance, and modeling tolerance. Similarly, the gaps $G_2$ and $G_3$ are the gaps between the second hole $H_2$ and the second supporting portion $P_2$, depending on thermal expansion coefficient of the optical film 12, panel temperature, room temperature, manufacturing tolerance, and modeling tolerance. Thus, the gaps $G_1$, $G_2$, and $G_3$ provide allowance for film expansion and contraction due to temperature variation.

The elliptical shapes of the holes $H_1$ and $H_2$ constrain the movement range of the supporting portions $P_1$ and $P_2$ in directions I and J. When the frame 15 is disposed at the first position, the first supporting portion $P_1$ contacts the first hole $H_1$ to support the optical film 12, and the first hole $H_1$ constrains the first supporting portion $P_1$ in direction I, thereby restricting the movement of the optical film 12 in direction I. The second supporting portion $P_2$ does not support the optical film 12 at the first position with the gap $G_2$ formed along the Y-axis. Thus, when the optical film 12 expands or contracts due to temperature variation, or when the optical film 12 is pulled by self-weight, the second supporting portion $P_2$ does not contact the second hole $H_2$ of the optical film 12. Since there is no contact between the second supporting portion $P_2$ and the second hole $H_2$, stress does not build therebetween. Moreover, the gaps $G_1$ and $G_2$ allow the optical films 12 to freely expand or contract, thereby preventing Mura defects.

When the frame 15 is rotated to the second position (FIG. 3B) by rotating 180°, the upper edge 22 becomes the upper edge, and the first edge 21 becomes the lower edge. The second supporting portion $P_2$ partially contacts the inner wall $S_3$ of the second hole $H_2$ to support the optical films 12. The gap $G_3$ is determined by thermal expansion coefficient of the optical film 12, panel temperature, room temperature, manufacturing tolerance, and modeling tolerance. Thus, at the second position, only the second supporting portion $P_2$ supports the optical film 12. The second hole $H_2$ constrains the movement range of the second supporting portion $P_2$ in direction I. The first supporting portion $P_1$ does not support the optical film 12, leaving a gap $G_1$ therebetween. During

6

expansion or contraction, the gaps $G_1$ and $G_3$ allow the optical films 12 to freely expand or contract, thereby preventing Mura defects.

Note that the first supporting portion $P_1$ and the second supporting portion $P_2$ each comprise a protrusion, a cylinder, or a cuboid. The first hole $H_1$ and the second hole $H_1$ are circular, elliptical, rectangular, rectangular with rounded corners, or polygonal.

The first embodiment has a variation, applicable in large-sized liquid crystal displays. As the size of panel increases, the size of the optical films 12a and the frame also increase. Thus, the number of holes for positioning the films is determined by the size of the liquid crystal display.

In this variation, the optical film 12a comprises three pairs of holes defined thereon, as shown in FIG. 3C. That is, except for the above mentioned first hole $H_1$ and second hole $H_2$, another pair comprising the third hole $H_3$ and the fourth hole $H_4$ are respectively defined on the adjacent corners of the edge 23 of the optical film 12a, and another pair comprising the fifth hole $H_5$ and the sixth hole $H_6$ are respectively defined on the adjacent corners of the edge 24 of the optical film 12a. When the liquid crystal display is suspended at the first position, the holes $H_3$, $H_1$, and $H_5$ at the edge 21 of the optical film 12a become the constraining portions to restrict the movement of the optical film 12a. The edge 21 becomes an upper edge and the other holes $H_4$, $H_2$, and $H_6$ are located at the opposite edge 22, the lower edge. As shown, the holes $H_3$, $H_1$, and $H_5$ and the holes $H_4$, $H_2$, and $H_6$ are symmetrically arranged with respect to the central point $C_0$ on the axis $C_Y$ in direction X.

The frame, not shown, also comprises three pairs of supporting portions. Each supporting portion extends from the lamp holder of the frame. Except the first and the second supporting portions $P_1$ and $P_2$ as mentioned in the first embodiment, another pair comprising supporting portions, the third and the fourth supporting portions $P_3$ and $P_4$ respectively penetrate the third hole $H_3$ and the fourth hole $H_4$. Another pair comprising supporting portions, the fifth and the sixth supporting portions $P_5$ and $P_6$ respectively penetrate the fifth hole $H_5$ and the sixth hole $H_6$. The supporting portions $P_1$, $P_2$, $P_3$, $P_4$, $P_5$, and $P_6$ comprise transparent plastic, metal or other materials.

In this variation, the first and the second holes $H_1$ and $H_2$ are elliptical. The third, fourth, fifth, and sixth holes $H_3$, $H_4$, $H_5$, and $H_6$ are rectangular with rounded corners, different from the first and the second holes.

The shapes of the holes determine the movable range of the supporting portions, thereby constraining the supporting portions.

Since the holes $H_1$ and $H_2$ are elliptical, the short axes of the holes $H_1$ and $H_2$ are slightly larger than the radii of the supporting portions $P_1$ and $P_2$ such that the supporting portions $P_1$ and $P_2$ are immovable in direction I, but can move in direction J.

Additionally, the supporting portions $P_3$, $P_4$, $P_5$, and $P_6$ pass through the rectangular holes $H_3$, $H_4$, $H_5$, and $H_6$ with rounded corners, movable in direction I or J. Thus, at the first position, only the supporting portions $P_3$, $P_1$, and $P_5$ located at the upper edge partially contact the inner walls $S_3$, $S_1$, and $S_5$ of the holes $H_3$, $H_1$, and $H_5$ to position the optical film 12a.

Moreover, predetermined gaps $G_{1,1}$, $G_{2,1}$, $G_{3,1}$, $G_{3,1}$, $G_{4,1}$, $G_{4,1}$, $G_{5,1}$, $G_{5,1}$, $G_{6,1}$, and $G_{6,1}$ are formed between every hole $H_1$, $H_2$, $H_3$, $H_4$, $H_5$, and $H_6$ and every supporting portion $P_1$, $P_2$, $P_3$, $P_4$, $P_5$, and $P_6$. The dimensions of the gaps $G_{1,1}$, $G_{2,1}$, $G_{3,1}$, $G_{3,1}$, $G_{4,1}$, $G_{4,1}$, $G_{5,1}$, $G_{5,1}$, $G_{6,1}$, and $G_{6,1}$ are determined by the thermal expansion coefficient of the optical film 12a,

US 7,125,157 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

panel temperature, room temperature, manufacturing tolerance, and modeling tolerance. As shown in the figures, the first and the second supporting portions $P_1$ and $P_2$ are respectively movable in the gaps $G_{1X}$, $G_{2Y}$ in direction J. The third, fourth, fifth, and sixth supporting portions $P_1$, $P_2$, $P_3$, $P_4$, $P_5$, and $P_6$ are movable in the gaps $G_{3X}$, $G_{3Y}$, $G_{4X}$, $G_{4Y}$, $G_{5X}$, $G_{5Y}$, $G_{6X}$, and $G_{6Y}$.

Note that the gaps of the third and the fifth supporting portions $P_3$ and $P_5$ located near the sides 23 and 24 close to the upper edge 21 function differently. The gap $G_{3Y}$ is an allowance for thermal expansion of the optical film $12a$ in the direction X. The gap $G_{3Y}$ is an allowance for thermal expansion of the optical film $12a$ in the direction Y. Similarly, the gap $G_{5X}$ is an allowance for thermal expansion of the optical film $12a$ in the direction X. The gap $G_{5Y}$ is an allowance for thermal expansion of the optical film $12a$ in the direction Y, and vice versa. Thus, the first supporting portion $P_1$ acts as a central supporting point at the upper edge of the optical film $12a$. As a result, the optical film $12a$ may freely expand or contract upward, downward, leftward, or rightward, as shown by the dashed arrows.

To position the liquid crystal display at various angles, such as rotated to 180° from the initial position, the holes are symmetrically arranged with respect to the central point $C_0$, and thus, the position of the optical films can be correctly maintained. At the upside down position, the second edge 22 becomes the upper edge. The first edge 21 becomes the lower edge. The holes $H_4$, $H_2$, and $H_6$ are the constraining portions for supporting the film. Only the supporting portions $P_4$, $P_2$, and $P_6$ partially contact the inner walls of the holes $H_4$, $H_2$, and $H_6$. Thus, other supporting portions do not support the optical films, allowing thermal expansion and contraction.

In conclusion, the pairs of holes are symmetrically defined on the optical films 12 at opposite corners, adjacent corners, or adjacent edges. The liquid crystal display of the embodiments of the invention can freely rotate from 0° to 360° without causing Mura defects.

FIGS. 4A to 4D are the schematic diagrams of the second embodiment of the invention, showing the relative positions of the supporting portions $P_1'$, $P_2'$, $P_3'$, $P_4'$, $P_5'$, $P_1''$, $P_2''$, $P_3''$, $P_4''$, $P_5''$ when the film is rotated from the first to the second, third, and fourth position. The position angles of 0°, 90°, 180°, and 270° of the liquid crystal display are shown as examples.

As shown in FIG. 4A, three pairs of symmetrically arranged holes, $H_1'$ and $H_1''$, $H_2'$ and $H_2''$, $H_3'$ and $H_3''$ are disposed at opposite edges 21 and 22 of the optical film $12b$. When the liquid crystal display is disposed at the first position (angle 0°), only the supporting portions $P_1'$, $P_2'$, and $P_3'$ on the frame (not shown) partially contact the inner walls of the holes $H_1'$, $H_2'$ and $H_3'$ to support the optical film $12b$.

As shown in FIG. 4B, two pairs of symmetrically arranged holes, $H_4'$ and $H_4''$ and $H_5'$ and $H_5''$, are disposed at the opposite edges 23 and 24 of the optical film $12b$. When the liquid crystal display is disposed at the second position, rotated from 0° to 90°, only the supporting portions $P_4'$ and $P_5'$ on the frame (not shown) partially contact the inner walls of the holes $H_4'$ and $H_5'$ to support the optical film $12b$.

As shown in FIG. 4C, when the liquid crystal display is disposed at the third position, rotated from 0° to 180°, only the supporting portions $P_1''$, $P_2''$, and $P_3''$ on the frame (not shown) partially contact the inner walls of the holes $H_1''$, $H_2''$ and $H_3''$ to support the optical film $12b$.

As shown in FIG. 4D, when the liquid crystal display is disposed at the fourth position, rotated from 0° to 270°, only the supporting portions $P_4''$ and $P_5''$ on the frame (not

shown) partially contact the inner walls of the holes $H_4''$ and $H_5''$ to support the optical film $12b$.

To simplify the figures, only gaps $G_4'$ and $G_5'$ are shown as examples. Gaps are formed between each hole and each supporting portion in both directions X and Y. The gaps are determined by thermal expansion coefficient of the optical films, panel temperature, room temperature, manufacturing tolerance, and modeling tolerance. Thus, when rotating the liquid crystal display, the gaps are the allowable movement range for the supporting portions, preventing direct contact between the holes and the supporting portions. Thus, stress concentration is prevented. The optical films may freely expand or contract without causing Mura defects.

While the invention has been described by way of example and in terms of the preferred embodiments, it is to be understood that the invention is not limited to the disclosed embodiments. To the contrary, it is intended to housing various modifications and similar arrangements (as would be apparent to those skilled in the art). Therefore, the scope of the appended claims should be accorded the broadest interpretation so as to encompass all such modifications and similar arrangements.

What is claimed is:

1. A backlight unit for a liquid crystal display, comprising:
   a frame;
   a first supporting portion, disposed on the frame;
   a second supporting portion, further disposed on the frame; and
   a film comprising a first constraining portion and a second constraining portion, positioned on the frame by the first supporting portion and the second supporting portion passing through the first constraining portion and the second constraining portion, respectively;
   when the frame is disposed in a first position, the first supporting portion partially contacts an inner wall of the first constraining portion for positioning the film, and the second supporting portion does not contact the second constraining portion; and
   when the frame is disposed in a second position, the second supporting portion partially contacts an inner wall of the second constraining portion for positioning the film and the first supporting portion does not contact the first constraining portion.

2. The backlight unit as claimed in claim 1, wherein the first constraining portion comprises a hole or a groove, and the second constraining portion comprises a hole or a groove.

3. The backlight unit as claimed in claim 1, wherein the first constraining portion and the second constraining portion are respectively formed on opposite edges of the film.

4. The backlight unit as claimed in claim 3, further comprising a third constraining portion and a fourth constraining portion disposed on the frame, and the film further comprises a third constraining portion and a fourth constraining portion respectively formed on opposite corners of the film; and the third constraining portion and the fourth constraining portion pass through the first constraining portion and the second constraining portion, respectively.

5. The backlight unit as claimed in claim 3, further comprising a third constraining portion and a fourth constraining portion disposed on the frame, and the film further comprises a third constraining portion and a fourth constraining portion respectively formed on adjacent corners of the film; and the third constraining portion and the fourth constraining portion pass through the first constraining portion and the second constraining portion, respectively.

9

6. The backlight unit as claimed in claim 1, wherein the first constraining portion and the second constraining portion are respectively formed on opposite corners of the film.

7. The backlight unit as claimed in claim 1, wherein the first constraining portion and the second constraining portion are respectively formed on adjacent corners of the film.

8. The backlight unit as claimed in claim 1, wherein the first constraining portion and the second constraining portion are symmetrically arranged with respect to a center point of the film.

9. The backlight unit as claimed in claim 1, wherein when the frame is disposed in the second position, a first gap is formed between the first supporting portion and the first constraining portion, and the first gap is an allowance for film expansion or contraction due to temperature variation; when the frame is disposed in the first position, a second gap is formed between the second supporting portion and the second constraining portion, and the second gap is an allowance for film expansion or contraction due to temperature variation.

10. The backlight unit as claimed in claim 1, wherein the first supporting portion and the second supporting portion each comprises a protrusion, a cylinder, or a cuboid.

11. The backlight unit as claimed in claim 1, wherein the first constraining portion and the second constraining portion is circular, elliptical, rectangular, rectangular with rounded corners, or polygonal.

12. The backlight unit as claimed in claim 1, wherein when the frame is disposed at the first position, the first constraining portion and the first supporting portion constrain a movement range of the film in a direction perpendicular to a gravity-acting direction, and the frame and the first supporting portion constrain the movement range of the film in an extending direction of the first supporting portion.

13. The backlight unit as claimed in claim 1, wherein when the frame is disposed at the second position, the second constraining portion and the second supporting portion constrain a movement range of the film in a direction perpendicular to a gravity-acting direction, and the frame and the second supporting portion constrain the movement range of the film in an extending direction of the second supporting portion.

14. The backlight unit as claimed in claim 1, wherein the first constraining portion is elliptical, and when the frame moves to the first position or the second position, a long axis of the elliptical first constraining portion corresponds to a direction of the weight of the frame pulling downwards, and a movement range of the first supporting portion is constrained by a short axis of the elliptical first constraining portion.

15. The backlight unit as claimed in claim 1, wherein the frame further comprises a lamp holder, and the first sup-

10

porting portion and the second supporting portion extend from the lamp holder toward the film.

16. A liquid crystal display, comprising:
a housing, movable between a first position and a second position; and
a backlight unit, disposed in the housing, comprising:
a frame comprising a first supporting portion and a second supporting portion; and
a film comprising a first constraining portion and a second constraining portion;
when the frame is disposed in a first position, the first supporting portion supports the first constraining portion for positioning the film, and the second supporting portion does not contact the second constraining portion; and
when the frame is disposed in a second position, the second supporting portion supports the second constraining portion for positioning the film, and the first supporting portion does not contact the first constraining portion.

17. The liquid crystal display as claimed in claim 16, wherein the first constraining portion and the second constraining portion are holes in circular, elliptical, rectangular, rectangular with rounded corners, or polygonal.

18. The liquid crystal display as claimed in claim 16, wherein when the frame is disposed in the first position, a gap is formed between the second constraining portion and the second supporting portion; and when the frame is disposed in the second position, a gap is formed between the first constraining portion and the first supporting portion.

19. The liquid crystal display as claimed in claim 16, wherein the first constraining portion and the second constraining portion are respectively formed on opposite edges of the film.

20. The liquid crystal display unit as claimed in claim 16, wherein the first constraining portion and the second constraining portion are respectively formed on opposite corners of the film.

21. The liquid crystal display as claimed in claim 16, wherein the first constraining portion and the second constraining portion are respectively formed on adjacent corners of the film.

22. The liquid crystal display as claimed in claim 16, wherein the first supporting portion and the second supporting portion each comprises a protrusion, a cylinder, or a cuboid.

23. The liquid crystal display as claimed in claim 16, wherein angles of rotation between the first position and the second position are 90°, 180°, or 270°.

* * * * *

# EXHIBIT C



US007090506B2

(12) **United States Patent**  (10) Patent No.: **US 7,090,506 B2**
Sung et al.  (45) Date of Patent: **Aug. 15, 2006**

(54) **SIGNAL TRANSMISSION DEVICE HAVING FLEXIBLE PRINTED CIRCUIT BOARDS**

(75) Inventors: Kuang-Tao Sung, Fongyuan (TW); Jun-Hsian Lao, Keelung (TW)

(73) Assignee: Au Optronics Corp., Hsinchu (TW)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 9 days.

(21) Appl. No.: 10/921,462

(22) Filed: Aug. 19, 2004

(65) **Prior Publication Data**
US 2005/0233611 A1  Oct. 20, 2005

(30) **Foreign Application Priority Data**
Apr. 19, 2004  (TW) .............................. 93110823 A

(51) Int. Cl.
*H01R 12/00*  (2006.01)
*H05K 1/00*  (2006.01)
(52) U.S. Cl. ......................................... 439/67; 439/581
(58) Field of Classification Search ................. 439/67, 439/581
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,418,691 A | * | 5/1995 | Tokura ........................ 361/803 |
| 5,592,365 A | * | 1/1997 | Sugimoto et al. ............. 361/789 |
| 5,684,550 A | * | 11/1997 | Shibata et al. ................. 349/62 |
| 6,045,368 A | * | 4/2000 | Cadenhead et al. ........... 439/67 |
| 2005/0185127 A1 | * | 8/2005 | Fujiyama et al. ........... 349/149 |

* cited by examiner

*Primary Examiner*—Hae Moon Hyeon
(74) *Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley

(57) **ABSTRACT**

A signal transmission device. The signal transmission device comprises a first and a second flexible printed circuit boards, connecting an display module and a system. The first flexible printed circuit board electrically connects the display module and the system. The second flexible printed circuit board electrically connects the display module and the first flexible printed circuit board, wherein the first and second flexible printed circuit boards are joined by hot bar soldering or anisotropic conductive film (ACF) bonding.

23 Claims, 4 Drawing Sheets





FIG. 1 (RELATED ART)



FIG. 2

<u>A</u>



FIG. 3a



FIG. 3b



FIG. 4a



FIG. 4b

US 7,090,506 B2

1

# SIGNAL TRANSMISSION DEVICE HAVING FLEXIBLE PRINTED CIRCUIT BOARDS

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates in general to a signal transmission device and in particular to a signal transmission device communicating multiple signals between a liquid crystal display (LCD) module and a system.

2. Description of the Related Art

Generally, a conventional touchscreen LCD module comprises an LCD panel, a touch panel and a light source. Referring to FIG. 1, the conventional touchscreen LCD module 10 communicates LCD panel, touch panel and light source signals to a system (not shown) through flexible printed circuit boards 102, 104 and 106. To receive the three types of signals, however, three connecting ports corresponding to the flexible printed circuit boards 102, 104 and 106 are required in the system, thus, it incurring additional fabrication cost and space.

## SUMMARY OF THE INVENTION

Accordingly, an object of the present invention is to provide a signal transmission device. The signal transmission device comprises a first and a second flexible printed circuit boards, connecting an LCD module and a system. The first flexible printed circuit board electrically connects the LCD module and the system. The second flexible printed circuit board electrically connects the LCD module and the first flexible printed circuit board, wherein the first and second flexible printed circuit boards are joined by hot bar soldering or anisotropic conductive film (ACF) bonding.

## DESCRIPTION OF THE DRAWINGS

The present invention will become more fully understood from the detailed description given hereinbelow and the accompanying drawings, given by way of illustration only and thus not intended to be limitative of the present invention.

FIG. 1 is a perspective diagram of a conventional signal transmission device connecting an LCD module;

FIG. 2 is a perspective diagram of the signal transmission device in accordance with the present invention;

FIG. 3a is a perspective diagram of the first embodiment in accordance with the present invention;

FIG. 3b is a side view of the X direction corresponding to FIG. 3a;

FIG. 4a is a perspective diagram of the second embodiment in accordance with the present invention; and

FIG. 4b is a side view of the X direction corresponding to FIG. 3a.

## DETAILED DESCRIPTION OF THE INVENTION

First Embodiment

Referring to FIG. 2, the signal transmission device of the present invention comprises first, second and third flexible printed circuit boards 102, 104 and 106 electrically connecting the touchscreen display module 10 and a system (not shown). The first flexible printed circuit board 102 communicates display panel signal between the touchscreen display module 10 and the system via the connector 1020. Specifi-

2

cally, the second and third flexible printed circuit boards 104 and 106 individually communicate a touch panel signal and a light source signal between the touchscreen display module 10 and the system through the first flexible printed circuit board 102.

As the areas A and B in FIG. 2, the second and third flexible printed circuit boards 104 and 106 are joined to the first flexible printed circuit board 102, thereby touch panel and light source signals from the touchscreen display module 10 can be collected in the first flexible printed circuit board 102 and communicated to the system via the connector 1020. That is, the display panel, touch panel and light source signals are integrated in the first flexible printed circuit board 102 and communicated to the system through a single connector 1020.

As shown in FIG. 3b, the first and second flexible printed circuit boards 102 and 104 are joined by hot bar soldering via corresponding soldering pads S. Thus, the touch panel signal of the second flexible printed circuit board 104 is collected in the first flexible printed circuit board 102. Referring to FIG. 3a, the second flexible printed circuit board 104 further comprises several longitudinal openings Hi adjacent to the soldering pads S preventing short circuits due to solder overflow. The opening H1, however, can be also disposed in the first flexible printed circuit board 102.

In FIG. 3a, the first flexible printed circuit board 102 defines a connection area 1021 with soldering pads S disposed thereon. Moreover, several alignment marks M are correspondingly disposed around the periphery of the connection area 1021 and the second flexible printed circuit board 104. Accurate positioning and connection is accomplished by aligning the alignment marks M on the first and second flexible printed circuit boards 102 and 104 during assembly. Similarly, the alignment marks M can also be applied to the third flexible printed circuit board 106 for accurate connection of the first flexible printed circuit board 102 as shown by the area B in FIG. 2.

Second Embodiment

Referring to FIGS. 4a and 4b, the first and second flexible printed circuit boards 102 and 104 are joined by anisotropic conductive film (ACF) bonding via corresponding soldering pads S. As shown in FIG. 4b, an anisotropic conductive film F is electrically bonded between the soldering pads S of the first and second flexible printed circuit boards 102 and 104. Thus, the touch panel signal of the second flexible printed circuit board 104 can be collected in the first flexible printed circuit board 102.

In FIG. 4a, the first and second flexible printed circuit boards 102 and 104 are aligned via alignment holes H2. Accurate positioning and connection is accomplished by aligning the alignment holes H2 of the first and second flexible printed circuit board 102 and 104. Similarly, the alignment hole H2 can also be applied to the third flexible printed circuit board 106 for accurate connection of the first flexible printed circuit board 102 as shown by the area B in FIG. 2.

In summary, the present invention provides a signal transmission device capable of collecting touch panel and light source signals together in the first flexible printed circuit board 102. Thus, touch panel, light source and display panel signals between the touchscreen display module 10 and the system can be communicated through a single connector 1020 of the flexible printed circuit board 102. As mentioned, each flexible printed circuit board can be joined by hot bar soldering or anisotropic conductive film (ACF) bonding. Moreover, the alignment marks M or openings H2

US 7,090,506 B2

3

can be applied to each flexible printed circuit board for accurate positioning and connection. As only a single connector is required to communicate the multiple signals between the touchscreen display module 10 and the system, fabrication cost and space required for assembly can be reduced.

While the invention has been described by way of example and in terms of the preferred embodiments, it is to be understood that the invention is not limited to the disclosed embodiments. To the contrary, it is intended to cover various modifications and similar arrangements (as would be apparent to those skilled in the art). Therefore, the scope of the appended claims should be accorded the broadest interpretation to encompass all such modifications and similar arrangements.

What is claimed is:

1. A signal transmission device, connecting a display module and a system, comprising: a first flexible printed circuit board, electrically connecting the display module and the system and a second flexible printed circuit board, electrically connecting the display module and the first flexible printed circuit board, wherein the first and second flexible printed circuit boards are joined by hot bar soldering.

2. The signal transmission device as claimed in claim 1, wherein a first alignment mark of the first flexible printed circuit board is aligned with a second alignment mark of the second flexible printed circuit board.

3. The signal transmission device as claimed in claim 1, wherein the first flexible printed circuit board has a first alignment hole, and the second flexible printed circuit board has a second alignment hole aligned to the first alignment hole.

4. The signal transmission device as claimed in claim 1, wherein the second flexible printed circuit board has an opening adjacent to the connection of the first and second flexible printed circuit boards.

5. The signal transmission device as claimed in claim 1, wherein the first flexible printed circuit board transmits an display panel signal.

6. The signal transmission device as claimed in claim 1, wherein the second flexible printed circuit board transmits a touch panel signal.

7. The signal transmission device as claimed in claim 1, wherein the second flexible printed circuit board transmits a light source signal.

8. The signal transmission device as claimed in claim 1, further comprising a third flexible printed circuit board electrically connecting the display module and the first flexible printed circuit board.

9. A signal transmission device, connecting an display module and a system, comprising: a first flexible printed circuit board, electrically connecting the display module and the system; and a second flexible printed circuit board, electrically connecting the display module and the first flexible printed circuit board, wherein the first and second flexible printed circuit boards are joined by anisotropic conductive film (ACF) bonding.

10. The signal transmission device as claimed in claim 9, wherein a first alignment mark of the first flexible printed

4

circuit board is aligned with a second alignment mark of the second flexible printed circuit board.

11. The signal transmission device as claimed in claim 9, wherein the first flexible printed circuit board has a first alignment hole, and the second flexible printed circuit board has a second alignment hole aligned to the first alignment hole.

12. The signal transmission device as claimed in claim 9, wherein the second flexible printed circuit board has an opening adjacent to the connection of the first and second flexible printed circuit boards.

13. The signal transmission device as claimed in claim 9, wherein the first flexible printed circuit board transmits a display panel signal.

14. The signal transmission device as claimed in claim 9, wherein the second flexible printed circuit board transmits a touch panel signal.

15. The signal transmission device as claimed in claim 9, wherein the second flexible printed circuit board transmits a light source signal.

16. The signal transmission device as claimed in claim 9 further comprising a third flexible printed circuit board electrically connecting the display module and the first flexible printed circuit board.

17. A signal transmission device, connecting an display module and a system, comprising:
a first flexible printed circuit board, electrically connecting the display module and the system; and
a second flexible printed circuit board, electrically connecting the display module and the first flexible printed circuit board, wherein the first flexible printed circuit board has a first alignment mark, and the second flexible printed circuit board has a second alignment mark overlapped with and aligned to the first alignment mark.

18. The signal transmission device as claimed in claim 17, wherein the first flexible printed circuit board further has a first alignment hole, and the second flexible printed circuit board further has a second alignment hole aligned to the first alignment hole.

19. The signal transmission device as claimed in claim 17, wherein the second flexible printed circuit board further has an opening adjacent to the connection of the first and second flexible printed circuit boards.

20. The signal transmission device as claimed in claim 17, wherein the first flexible printed circuit board transmits an display panel signal.

21. The signal transmission device as claimed in claim 17, wherein the second flexible printed circuit board transmits a touch panel signal.

22. The signal transmission device as claimed in claim 17, wherein the second flexible printed circuit board transmits a light source signal.

23. The signal transmission device as claimed in claim 17, further comprising a third flexible printed circuit board electrically connecting the display module and the first flexible printed circuit board.

* * * * *